# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CR. NO. 19-CR-00166--01(DLF) |
| | : |
| MARCEL VINES, | : |
| | : |
| Defendant. | : |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant be detained pending trial pursuant to 18 U.S.C. §§ 3142 (f)(1)(A), (f)(1)(B), (f)(1)(E), (f)(2)(A), and 3142(d)(1)(A)(iii) of the federal bail statute. The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## Introduction

Marcel Vines, twenty-three years old, has been charged in this matter by indictment with two counts of Kidnapping Resulting in Death and Aiding and Abetting, in violation of 18 U.S.C. § 1201(a)(1) and § 2 [Counts One and Two]; two counts of Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i),(ii), and (iii) and § 2 [Counts Three and Four]; Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. §

1

922(g)(1) [Count Five]; two counts of Kidnapping While Armed and Aiding and Abetting, in violation of 22 D.C. Code §§ 2001, 4502, and 1805 (2001 ed.) [Counts Seven and Eight]; two counts of First Degree Murder While Armed—Felony Murder and Aiding and Abetting, in violation of 22 D.C. Code §§ 2101, 4502, 2104.01(b)(1), and 1805 [Counts Nine and Ten]; and First Degree Murder (Premeditated) While Armed and Aiding and Abetting, in violation of 22 D.C. Code §§ 2101, 4502, 2104.01(b)(1), and 1805 [Count Eleven].   The defendant's indictment indicating a finding of probable cause that he unlawfully possessed firearms and ammunition, the nature and the circumstances of the offenses charged, the weight of the evidence against the defendant, and his criminal history and other circumstances – as well as the rebuttable presumption for his detention given the 924(c) Offense, all support the government's contention that the defendant should be held without bond pending trial.   The defendant clearly poses a danger to the community and a flight risk.

## Procedural History and Applicable Authority

At the presentment on May 23, 2019, the government orally moved for detention pending trial pursuant to 18 U.S.C. §§ §§ 3142 (f)(1)(A), (f)(1)(B), (f)(1)(E), (f)(2)(A), and 3142(d)(1)(A)(iii) of the federal bail statute, which was granted by the Court.   The Court set a detention hearing for Wednesday, May 29, 2019.

The government contends that the defendant is a danger to the community and a flight risk.   The government must establish by preponderance of the evidence that a defendant poses a risk of flight, *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986), and must establish by clear and convincing evidence that a defendant is a danger to the community, *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988).   In an indicted case at a detention hearing, the

government may proffer evidence. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering either justification, it should be noted that the 924(c) Offense charged here carries with it a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense. 18 U.S.C. § 3142(e)(3) and (e)(3)(B).  To be sure, that presumption is rebuttable and does not shift the ultimate burden of proof from the government's shoulders.  But it does create a burden of *production* on the defense to submit at least some credible evidence that might purport to overcome it.   And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court amongst others in determining whether the defendant should be detained, and the presumption should retain "evidentiary weight."   *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); *United States v. Rueben*, 974 F.2d. 580, 586 (5th Cir. 1992) (the mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . .

Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . . *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach)" (internal citation omitted)); *see also United States v. Ali*, 793 F.Supp.2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

There are four factors under Section 3142(g) that the Court should consider and weigh in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.  *See* 18 U.S.C. § 3142(g).  A review and understanding of the facts and circumstances in this case demonstrate that there is no condition or combination of conditions that would assure the appearance of the defendant as required or the safety of the community, even apart from the rebuttable presumption against his release.  Therefore, the defendant should be detained. *See* 18 U.S.C. § 3142(e)(1).

### Nature and Circumstances of the Offenses Charged

The indictment in this case arises from the brutal murders of two individuals on December 28, 2017.   At about 6:20 p.m., decedent Armani Coles was shot while in the backseat of a car, and then pushed from the car onto highway 295, just before the D.C. border. Approximately an hour later, decedent Kerrice Lewis was shot while inside the trunk of a car, which was then ignited and burned, in the 800 block of Adrian Street, S.E., in Washington, D.C.

Analysis of the ballistic evidence from both scenes indicates that two firearms, a .45 caliber and a 7.62mm caliber, were used to kill each decedent, and that the same two guns were used to kill both individuals.

The evidence demonstrates that the three defendants in this matter: Marcel Vines, also known as "BY" and "Baby Boy;" Malique Lewis, also known as "Freak;" and Ashton Briscoe, also known as "A2" and "Astro," were responsible for the murders of decedent Armani Coles and decedent Kerrice Lewis. Based on the evidence gathered to date, the government believes that defendants Vines and Lewis were likely the actual shooters, that the three defendants worked together in bringing about the deaths, and that the defendants killed decedents Coles and Lewis out of a desire for revenge against a perceived friend of the decedents, Dennis Whitaker. In turn, the motive for that revenge had arisen only hours earlier, at approximately 11:20 a.m. on December 28, when Dennis Whitaker shot and killed a friend of the defendants, Ronzay Green.

The nature of the evidence against the defendants includes a variety of sources. Both Vines and Lewis were heard uttering that someone had to pay for the death of Mr. Green. Cell tower records indicate movement of the defendants consistent with a kidnapping and subsequent murder of the decedents, and phone records also show the three defendants were in contact with one another at various points of the day. Vines' fingerprints were found on a box that was apparently tossed out of the car along with decedent Coles on the highway. Lewis sent text messages that evening with news reports of the two separate murder scenes and asserted that "we are not done," and evidence establishes he drove the decedent's rental car the day after decedent Coles' murder. And Briscoe, while not admitting culpability for the murders, ultimately made self-incriminating statements over the course of several interviews with law enforcement (which

he has since recanted).

### The Death of Ronzay Green

On December 28, 2017, members of the Metropolitan Police Department (hereinafter referred to as "MPD") were dispatched to a shooting scene at 950 Eastern Avenue in Northeast, Washington, DC, at approximately 11:24 am. At approximately 11:25, MPD officers arrived on scene and found Mr. Ronzay Green lying on the ground, unconscious and suffering from gunshot wounds. Also on scene, were three to four people hunched over Mr. Green's body, including Defendant Marcel Vines, who can be seen on MPD body worn camera footage kneeling next to Mr. Green's body, near his face, whispering to him. Defendant Vines, as captured on Body Worn Camera and supported by phone records, called Defendant Briscoe from that scene at 11:25:36 for approximately 17 seconds. At 11:25:21 am, cell phone records also show that a call from Defendant Lewis' phone was placed to Defendant Briscoe, which was a 25 second call. At 11:26:29, cell phone records show that a call to Defendant Briscoe was made from Defendant Vines' cell phone. Defendants Vines, Lewis and Briscoe and Mr. Ronzay Green are all close friends and known associates of the Clay Terrace neighborhood in Northeast, Washington, DC.

Mr. Green was taken by ambulance to the Prince George's County Hospital in Cheverly, Maryland. Defendants Vines and Lewis arrived at the hospital shortly after Mr. Green. While Defendants Vines and Lewis were at the hospital, doctors pronounced Ronzay Green dead. Almost immediately after Mr. Green was pronounced dead, both Defendants Vines and Lewis uttered words to the effect of "this isn't fair" and "someone has to pay." Defendants Vines and Lewis were then observed leaving the hospital together. In addition to eye witness evidence of Defendants Vines and Lewis' presence at the hospital, video camera footage from the hospital

and cell site records show Defendants Vines and Lewis at the hospital.

<u>Cell tower records regarding the defendants</u>

After Defendants Vines and Lewis left the hospital, cell cite records show their cell phones traveled, at approximately 2:00 pm, from the Clay Terrace neighborhood to the area of 1st and Kennedy Streets, which is the general area where both decedents were known to frequent. Defendants Vines and Lewis' cell phones appear to stay in that area for approximately one hour and then returned back to the Clay Terrace neighborhood.   From 1:30 pm to approximately 4:50 pm, decedent Coles' cell cite records indicate that decedent Coles was at work during that period of time, and separate evidence shows that he was last seen alive by an associate at approximately 5:24 p.m.   Sometime shortly after 4:00 pm, cell cite records show defendants Vines, Lewis and Briscoe's phones moved back to the 1st and Kennedy Street neighborhood, arriving at approximately 4:40 pm.   Sometime shortly before 6:00 pm, defendants Vines, Lewis and Briscoe as well as decedents Coles and Lewis cell site records indicate that all five individuals were utilizing cell towers in the 1st and Kennedy neighborhood.   Cell site records then show defendant Briscoe's cell phone traveled towards the Clay Terrace neighborhood, while defendants Vines and Lewis as well as decedents Coles and Lewis appeared, based on cell site records, to travel towards the site of Armani Coles' murder on I-295.    At the time of Armani Coles' murder, and for approximately the next 20 minutes, cell site records indicate that the phones belonging to defendants Vines and Lewis and decedent Coles appeared to stop travelling and stayed in the general area of Coles' murder.   Cell phone records also show that while they were in that area, defendants Vines and Lewis exchanged multiple phone calls with defendant Briscoe, who then traveled to the location of decedent Coles' murder. Cell site records then show

all three defendants and the two decedents cell phones travel in the direction of Kerrice Lewis' murder. Between 7:00 and 7:50 pm, cell site records show defendants Briscoe and Vines and decedent Coles' cell phones (he was at this point deceased) connecting to cell towers in the area of decedent Kerrice Lewis' murder. Also between 7:20 and 8:06 pm, cell site records show decedent Lewis and defendant Lewis' cell phones connecting to cell towers in the area of decedent Kerrice Lewis' murder.

### The murder of Armani Coles

At approximately 6:22 pm, MPD received calls for a shooting in progress on southbound 1-295, near Eastern and Kenilworth Avenues. The callers stated that the gunshots came from a grey four-door sedan that was in the far right-hand lane, also traveling southbound. Immediately after the gunshots, a caller observed the grey four-door sedan stop for a moment, and a man later identified as decedent Armani Coles, being pushed out of the vehicle. The vehicle then immediately drove up the Eastern Avenue exit ramp off of I-295. Based on the manner in which the decedent appeared to be pushed out of the vehicle, the witnesses believed the car must have had more than the decedent and the driver as occupants.

MPD officers arrived on the scene and observed Armani Coles laying face-down in the far right-hand lane of southbound 1-295 just before the exit ramp for Eastern Avenue and Kenilworth Avenue. He had multiple gunshot wounds to the body and was transported to the hospital, where all life-saving efforts failed. PGPD responded and took over processing the scene. Police recovered a fired bullet from the shoulder of the road, a black car seat-cover, and a box for a ProElite car seat-cover. Swabs of an apparent blood stain on the road were also taken. Missing was decedent Coles' rental car, a black 2017 Toyota Camry with NY tags FZH370.

On December 29, 2017, an autopsy was performed on the remains of decedent Coles by Dr. Bitting with the Baltimore Office of the Chief Medical Examiner.  Dr. Bitting determined that decedent Coles suffered a gunshot wound to his rear left shoulder, one gunshot wound to his abdomen, and abrasions on the right side of his face and left ankle.  He also suffered contusions throughout his left arm and leg. Dr. Bitting recovered a jacket fragment from decedent Coles' upper mid-abdomen, a deformed metal projectile from his left lower back, a jacket fragment below his right diaphragm, a deformed jacketed bullet from his right shoulder, a metal fragment inferior to his liver, and a fragment from below his diaphragm.  The manner of death was ruled a homicide.

The bullets recovered from the scene and the projectiles recovered from decedent Cole's remains were sent to the PGPD Firearms Examination Unit. A microscopic examination determined that the bullet recovered from 1-295 was consistent with a .45 Auto/.45 G.A.P. caliber bullet. Similarly, one of the bullets recovered from decedent Coles' remains was determined to be a .45 Auto/.45 G.A.P. caliber bullet. These two bullets shared discernible class characteristics but could neither be identified nor eliminated as having been fired from the same firearm.  A third bullet recovered from decedent Coles' remains during the autopsy was examined and determined to be consistent with a 7.62x39mm caliber bullet.

The box for the ProElite car seat-cover, which was found on 1-295 near decedent Coles' body, was dusted for fingerprints.  Four (4) latent prints were lifted from the box.  A Fingerprint Examiner with the FBI Laboratory Division determined that three (3) of those latent prints were of value for comparison purposes.  The three (3) prints of value were compared to the known prints of decedent Coles and defendants Vines and Lewis. One print was inconclusive

as to all three individuals.    However, two of the latent prints were identified as those of defendant Marcel Vines.

<u>The murder of Kerrice Lewis</u>

At approximately 7:18 pm, about an hour after decedent Cole's body was dumped on I-295, members of MPD and DC FEMS responded to the rear alley of 815 Adrian Street SE, Washington, DC, for the report of a shooting; as they responded to the scene, the call was updated to include a vehicle fire.   Emergency personnel entered the alley and observed a blue 1998 four-door Lexus sedan engulfed in flames.   They worked to extinguish the fire and detected an odor consistent with burning flesh emanating from the trunk.   After forcing the trunk open, members located the registered owner, Kerrice Lewis, unconscious and unresponsive with 4th degree burns to the body. She was pronounced on scene by Doctor Mitchell, Chief Medical Examiner for the DC Office of the Chief Medical Examiner (DC OCME).

Officers canvassed the area and located six (6) expended .45 caliber casings, one (1) expended 7.62x39mm casing, and one (1) 7.62x39mm cartridge on the ground near the trunk of the Lexus.   The car was subsequently towed to the Department of Forensic Sciences for processing.   One (1) expended .45 caliber casing, two (2) expended 7.62x39mm caliber casings, three (3) .45 caliber projectiles, and one (1) 7.62x39mm caliber projectile were recovered from inside the trunk.   A single expended .45 caliber casing and a red plastic gas container was recovered from the interior passenger compartment of the car.

On December 29, 2017, an autopsy was performed on the remains of decedent Lewis. At the conclusion of the procedure, Dr. Njiwaji, DC OCME, determined that the decedent sustained a total of thirteen (13) gunshots wounds throughout the body and extremities.   Six (6)

.45 caliber projectiles were recovered from decedent Lewis' remains: two (2) from her left thigh, one (1) from her right arm, one (1) from the soft tissue of her perineum, one (1) from her pelvic cavity, and (1) one from her pelvic bone.   Additional fragments were recovered from her left knee and neck.   Dr. Njiwaji determined that the cause of death was multiple gunshot wounds to the body and ruled the manner of death a homicide.

The six (6) .45 caliber projectiles recovered from decedent Lewis' remains were microscopically examined and compared to each other and to the .45 caliber projectiles recovered from the trunk.   A firearms analyst determined that the six (6) .45 caliber projectiles recovered from decedent Lewis' remains and one (1) of the .45 caliber projectiles recovered from the trunk were fired from the same barrel rifled with six (6) grooves, right twist.   One (1) of the other .45 caliber projectiles recovered from the trunk was examined, and it was determined that this .45 caliber projectile was also fired from a barrel with six (6) grooves, right twist, and was compatible with having been fired from the same firearm as the other .45 caliber projectiles, but did not contain sufficient markings to identify or eliminate it as having been fired from the same barrel.   The remaining .45 caliber projectile recovered from the trunk of the Lexus was determined to be too damaged to be suitable for comparison.

Similarly, the eight (8) .45 caliber casings recovered in and around the Lexus were all microscopically examined and compared to each other.   A firearms examiner determined that all but one were fired from the same firearm; the remaining casing was determined to be unsuitable for microscopic examination due to severe damage.   One of the eight (8) .45 caliber casings was recovered from the rear passenger floorboard of the Lexus, consistent with decedent Coles being shot inside the Lexus as described by 911 callers.

The three (3) 7.62x39mm caliber casings recovered in and around the Lexus were microscopically examined and compared to each other. A firearms examiner determined that all were fired from the same firearm. The 7.62x39mm caliber projectile recovered from the Lexus' trunk was microscopically examined and determined to have been fired from a barrel rifled with four (4) grooves, right twist. Firearms that may produce similar rifling impressions like those on the 7.62x39mm caliber copper jacket bullet include, but are not limited to, caliber 7.62mm pistols marketed by Norinco and PRC, and caliber 7.62mm rifles marketed by Norlnco, Polytech, PRC, Mitchell Arms and MAADI, all commonly referred to as assault rifles.

The .45 caliber bullet recovered from decedent Kerrice Lewis' pelvic bone was subsequently compared to at least one .45 caliber bullet removed from the remains of decedent Armani Coles. Upon examination, it was determined that both were shot with the same .45 caliber firearm. In addition, the 7.62x39mm caliber projectile recovered from the remains of decedent Coles was compared to the 7.62x39mm caliber projectile recovered from the trunk of the Lexus where decedent Lewis was found. Upon examination, it was determined by a DFS Firearms Examiner that both 7.62 caliber projectiles were fired from a firearm rifled with (4) grooves, right twist. A Firearms Examiner from PGPD determined that the same 7.62 caliber firearm fired both projectiles.

At the time of Kerrice Lewis' murder, a witness was in the vicinity of the 800 block of Adrian Street SE. The witness observed two vehicles consistent with decedent Coles' Toyota Camry and decedent Lewis' Lexus, drive into the alley. The witness then observed two males get out of the Lexus, open the trunk of the vehicle and begin shooting into the trunk. The witness then observed one of the males walk to the passenger area of the car and shoot into the

floorboard causing the interior of the car to light on fire. The witness also observed that one of the males had what appeared to be a long gun hanging over its shoulder by a strap. After the interior of the Lexus ignited on fire, the witness observed the males enter the vehicle that was consistent with the Toyota Camry.  One male got into the front passenger seat and the other into the rear driver's side door of the car.  The black four-door sedan fled as soon as the two males closed the vehicle doors, and the witness concluded that a third person was in the driver's seat of the black four-door sedan.  The witness observed the black four-door sedan flee the alley and turn right onto G Street SE.  (During an interview with law enforcement after his arrest, Defendant Briscoe admitted to law enforcement that he drove the car out of the alley.)  The witness then observed decedent Lewis' car engulfed in flames.

<u>Defendant Lewis text messages</u>

On December 28, 2017, shortly before 10:00 pm, Defendant Lewis sent text messages from his cell phone that included screen shot photos to news reports from earlier that evening. The first screenshot was for a news report from Fox 5 local District, Maryland and Virginia news titled, "Police Investigate Deadly Shooting near Interstate 295 at Maryland – DC Border". Immediately following, defendant Lewis sent another text message with a screenshot of a story by Fox 5 entitled "Body Recovered Inside Burning Car in Southeast, DC".  Defendant Lewis then followed these two text messages with two additional messages stating, "we aint dead" followed by a text message that stated, "Done*".

<u>Defendant Lewis driving rental vehicle of decedent Coles</u>

On December 30, 2019, two days after the murder of decedent Coles, law enforcement recovered Coles' rental car in an alley adjacent to the Clay Terrace complex.  Inside, law

13

enforcement found a McDonald's receipt that was time-stamped for December 29, 2017, at 11:14 p.m. (the day after the murder of decedent Coles) and connected to a McDonald's in Upper Marlboro, Maryland. Law enforcement obtained surveillance video from the drive-in window of that McDonald's, and at the approximate time listed on the receipt, the vehicle at the drive through window was the rental car of decedent Coles. The surveillance footage not only captured the license plate of decedent Coles' rental car, but also defendant Lewis as the driver of the car.

<u>Briscoe Statements to law enforcement</u>

On three separate occasions, defendant Briscoe was interviewed by law enforcement officials, the last of which occurred after his arrest for the murders. During his interviews, defendant Briscoe initially denied having any affiliation with the Clay Terrace neighborhood or knowing Dennis Whitaker. As the interviews progressed, however, defendant Briscoe acknowledged knowing more.

Among other things, he admitted to learning about Mr. Green's shooting shortly after it happened; later that day driving decedent Coles's rental vehicle; and driving the rental car to the location of decedent Lewis's murder, hearing gunshots, and driving away with two other individuals who got into the car after the gunshots. Defendant Briscoe has since written a retraction of his previous statements.

As set forth above, the first factor, the nature and circumstances of the offenses charged, clearly weighs in favor of detention. Here, a grand jury found probable cause to believe that the defendant unlawfully furthered the violent deaths of two individuals. The nature of this offense weighs heavily in favor of detention, even apart from the rebuttable presumption that arises from

the 924(c) Offense.

## Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.   The evidence against the defendants collectively and separately is strong.

## The Defendant's History and Characteristics

The third factor, the history and characteristics of the defendant, similarly weigh in favor of pre-trial detention.   According to the Pretrial Services Agency Report (PSR) of May 23, 2019, the defendant has convictions for three separate felony matters:   Escape in 18-cr-00042(RMC); Possession with Intent to Distribute PCP and Unlawful Possession of a Firearm in 2015-CF2-015181; and Attempted Unlawful Possession of Liquid PCP in 2015-CF2-003658.   The defendant was also under supervision in the last two matters at the time of the offenses alleged in the Indictment.   Furthermore, the defendant's history includes other matters discussed on page 4 of the PSR.

The defendant therefore has an extensive and recent criminal history.   That history underscores the danger he poses to the community.   The Escape conviction and the defendant's supervision at the time of the events in the Indictment are also evidence of a risk of flight, and that the Court cannot have confidence in the defendant's ability to abide by any conditions of release.

## Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention.   The offenses charged here are extremely violent in nature, and involve not just one but two murders.   In order

to protect the community and assure his appearance at future court proceedings, the defendant should be held without bond pending trial.

### There is No Condition or Combination of Conditions that Would Ensure the Defendant's Compliance with Court-Ordered Release Conditions

All of the factors discussed above warrant pre-trial detention, even apart from the rebuttable presumption for his detention which cannot be overcome under these circumstances. In order to ensure the safety of the community and the defendant's appearance, the Court should order him held without bond pending trial in this matter.

### Conclusion

The Court should grant the government's motion to detain the defendant pending trial.

                  JESSIE K. LIU
                  United States Attorney
                  D.C. Bar No. 472845
                  _____/s/_____
                  STEPHEN J. GRIPKEY
                  Assistant United States Attorney
                  D.C. Bar No. 445410
                  555 4th Street, NW, Room 4217
                  Washington, DC 20530
                  (202) 252-7237; fax: 202-616-2296
                  Stephen.Gripkey@usdoj.gov