## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:19-cr-166 (DLF)** |
| | ) | |
| MARCEL VINES, et al. | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION FOR PRODUCTION OF *BRADY* MATERIAL
### REGARDING JAILHOUSE INFORMANT OR "SNITCH" WITNESSES

COMES NOW the Defendant, Marcel Vines, by counsel, and respectfully moves this Court for an order compelling the prosecution to disclose favorable evidence regarding any and all jailhouse informants[1] who allegedly witnessed any inculpatory acts or statements attributed to Mr. Vines or his co-defendants during their period of pre-trial incarceration and will testify as prosecution witnesses about those acts or statements. In making this motion, Mr. Vines relies on his right to the timely disclosure of favorable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and other rights safeguarded by the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and the other authorities cited herein and in the accompanying memorandum of law.[2] In *Harshman v. Superintendent*, 368 F. Supp. 3d 776 (M.D. Pa. 2019), the court recently held a conviction cannot stand where the prosecution fails to disclose favorable evidence in its possession regarding a jailhouse informant.[3] In so doing, the Court recognized *Brady* disclosures regarding snitch witnesses must include, at a minimum, any information in the prosecution's possession regarding deals or agreements made with an informant witness, any other favorable treatment of the informant witness,

---

[1] Throughout this motion and accompanying memorandum, the terms "confidential informants," "jailhouse informants/snitches," "informants" and "snitches," are used interchangeably. In this context, these terms refer to any potential witness who will testify that he heard Mr. Vines or any of his co-defendants make inculpatory statements during their incarceration, whether or not that potential witness has received explicit promises or benefits in exchange for his testimony.

[2] Mr. Vines relies on constitutional rights including but not limited to his right to be free from cruel and unusual punishment, his right to due process, his right to a fair and impartial jury, his right to a fair trial, his right to the effective assistance of counsel, his right to present a defense, his right to confront the witnesses against him, his right to exculpatory evidence, and his right to reliable guilt and sentencing determinations.

[3] A copy of the Court's decision in *Harshman* is provided as **Attachment A**.

any possibility or expectation of favorable treatment, any evidence that impugns the reliability of the witness's testimony, and any evidence of bias, prejudice, or ulterior motives affecting the witness's credibility. *Id*. at 790.

In a recent state-level case in Virginia, circuit court judge Timothy K. Sanner entered a wide-ranging *Brady* Order requiring virtually all of the disclosures sought in the instant motion. *See* **Attachment B** (Order, *Commonwealth v. Darcel Nathaniel Murphy*, CR17000054-00 (Louisa County, VA June 13, 2018)). In that case, the prosecuting attorney was ordered to contact prosecutors in any jurisdiction in which the informant witness had previously been charged with a felony and inquire whether the potential informant witness had provided testimony for the government and/or received benefit in that jurisdiction. *See id*. at ¶ 4.

As a direct result of that Order, the defendant, was provided with a massive disclosure of favorable evidence demonstrating that the potential informant witness, Gregory Cook, had repeatedly sought to insert himself as a prosecution witness into high-profile homicide cases. In one 2006 homicide case, Cook had told state and federal investigators *four different versions of events* in an effort to become a prosecution witness. In his first debriefing, Cook claimed that he had seen the two homicide suspects together on the evening of the murder and that they made incriminating statements to him. In a second debrief several months later, Cook admitted that his first statement had been untrue. This time he claimed that he had actually been present when one of the suspects committed the murder. He admitted that he had lied in his first statement because "he was afraid he would get in trouble and he just threw [the second suspect's] name in because he actually did see him with [the shooter] earlier the night before." A month later, Cook gave yet a third version of events, admitting that neither the first nor the second proffer had been true, and that he had not actually seen either of the suspects on the night of the homicide. Cook explained that he had not actually seen anything that night, but had simply been relaying what his now-deceased cousin had told him that *she* observed. Later during that same debriefing, in his fourth and final statement, Cook refused to take a polygraph and "explained that this story was not true but would not come right out and say it was a 'lie.'" He then signed an affidavit (his third inconsistent affidavit in the matter) stating "I am not comfortable that the facts in the statement

are accurate enough to take a polygraph on them, I am refusing the test." All of the documents that were provided to counsel are included here as **Attachment C**. Ultimately, Cook was not used as a witness in the 2006 case because he was simply too unreliable. And yet, in 2018, Cook was still trying to become a prosecution witness by claiming that he had information about the defendant's charges.[4]

The information from a state-level murder case is included here because is illustrates the importance of requiring prosecutors to be diligent in tracking down exculpatory evidence regarding snitch witnesses. Had the judge in that case not ordered the prosecutor to take affirmative steps to find and disclose exculpatory evidence - including evidence that was in the possession of other jurisdictions - neither the prosecution nor the defense (nor the judge, nor the jury) would ever have had any idea about this potential snitch witness's brazen pattern of attempting to provide perjured testimony in homicide cases.[5] Mr. Vines is entitled to no less demanding process to ensure that the evidence against him is reliable and is subjected to thorough investigation and effective confrontation. Therefore, we ask the Court to enter a similarly far-reaching *Brady* Order in this case.

As is more fully discussed herein, jailhouse informant testimony is inherently suspect and notoriously unreliable. Moreover, as proved to be true in the *Murphy* case in Virginia, exculpatory information relating to such informants is uniquely available to the prosecution. For these reasons, a prosecutor's *Brady* obligation should be at its zenith when the government intends to rely on this type of evidence. Absent a Court order mandating robust *Brady* disclosures, Mr. Vines is unable to conduct any meaningful investigation of this alleged evidence or prepare his defense.

<u>**Request for *Brady* Information**</u>

Mr. Vines respectfully requests a Court order requiring the government to produce the following information no later than September 1, 2023:

---

[4] Ultimately the prosecution in Mr. Murphy's Virginia capital case did not call Cook at trial. On October 1, 2020, following three days of prosecution evidence, Judge Sanner granted a motion to strike and found Mr. Murphy not guilty of any of the charges against him, including capital murder.

[5] Indeed, shockingly, counsel learned that even after the informant had been dropped as a witness because of the repeated lies that he told to investigators, he later became a paid informant who conducted controlled drug buys for a narcotics task force in Central Virginia. This illustrates how easy it is for snitch witnesses not only to get away with lying, but actually to be rewarded for it.

1. To the extent that the prosecution intends to present testimony from such informants, the names, addresses, birth dates, and any government-issued identification numbers of any and all informants who allegedly witnessed any inculpatory acts or declarations attributed to Mr. Vines or his co-defendants during their periods of pre-trial incarceration.

2. Information that the expected and/or actual testimony of any informant witness is inconsistent with, or is refuted by, or fails to corroborate other information known to the prosecution, as well as any evidence regarding the circumstances of witness statements that indicates a lessened degree of reliability.  This request is for statements made to any individual, not only agents of the prosecution, and encompasses:
   i. Any notes taken during informal interviews conducted of the witnesses;
   ii. Any grand jury testimony, whether provided by the witnesses themselves, by a law enforcement proffer, or by other means;
   iii. Proffers made to the government by counsel for informant witnesses concerning the anticipated substance of their testimony.

3. To the extent that the government is aware, the identity of any persons with whom the witness or informant has discussed details of the allegations or other material facts (e.g. facts related to witness credibility, attempts to obstruct justice), including:
   i. The names of the persons with whom the witnesses/informants spoke and the relationship of those individuals to the declarant;
   ii. All available identifying and contact information for those individuals;
   iii. Where and when the conversations took place;
   iv. The contents of the statements to the extent they are known.

4. Any prior cases in which the informant witnesses have provided information to the government or testified as a prosecution witness in a criminal proceeding, including:
   i. The name of the defendant;
   ii. The date of such assistance or testimony;
   iii. The jurisdiction in which such assistance was provided;
   iv. The substance of such testimony;
   v. Any benefit that was provided to, or requested by, the witness in exchange for such assistance;
   vi. The substance of any statement or testimony provided by the witness.

5. Evidence tending to show that an informant witness was intoxicated, under the influence of prescription medication or other drugs, suffering from mental illness or cognitive disability, or otherwise impaired at the time that an alleged statement was made to him, when supplying statements to the government, or while testifying at any proceeding.

6. Evidence tending to show that the defendant or co-defendant was intoxicated, under the influence of prescription medication or other drugs, suffering from mental illness or cognitive disability (including depression and suicidal ideation) or otherwise impaired at the time that the alleged statement was made or at the time of the alleged offenses.

7. Any and all jail recordings by any potential informant witness containing inconsistent statements, character evidence, proof of intent or motive to lie or obstruct justice, etc.  This should include any jail recordings wherein the informant discusses:
   i. The facts of the case;
   ii. A desire for leniency;
   iii. The terms of any cooperation agreement;
   iv. An awareness or apprehension of the potential punishment the informant faces in his own case;

4

      v.       Negative feelings toward Torey Vines or any of his co-defendants, or anyone else associated with the case;

      vi.     An intent to lie or take steps necessary to minimize punishment;

      vii.    Attempts to obstruct justice or influence witnesses, as well as threats, express or implied, toward anyone associated with the case; or

      viii.   Attempts to obtain information regarding this case from sources other than Mr. Vines or one of his co-defendants.

8.     Records and information revealing prior criminal activity of any informant witness, including:

      i.       Felony convictions, guilty verdicts, or withheld findings of guilt;

      ii.      Juvenile adjudications relating to credibility or relevant to specific issues in the case or elements of the indictments;

      iii.     Convictions, guilty verdicts, or withheld findings of guilt for crimes of moral turpitude;

      iv.     Any unadjudicated bad acts that would constitute a felony, crime of moral turpitude, or delinquent conduct;

      v.      Any conduct, adjudicated or unadjudicated, that is relevant to the informant witness's credibility, including but not limited to criminal conspiracy, gang involvement, crimes committed for pecuniary benefit, obstruction of justice, perjury, threats, and violent behavior;

      vi.     Any instance where any informant witness was arrested, questioned about, or accused of a crime, regardless of whether he was prosecuted; or

      vii.    Any instance in which law enforcement officers prepared, filed, and served an affidavit or search warrant seeking an arrest or search of an informant witness's person, property, or communications, or where any witness was named in such a document even where they were not the actual target.

9.     Information revealing a prior reputation or disposition for untruthfulness of the potential witnesses for the prosecution. This includes a general reputation for deception or untruthfulness (e.g. that a witness is "sneaky"), whether that opinion is held by employers, neighbors, probation or parole officers, police officers, jailers, family members, friends, or acquaintances.  It further includes specific acts of lying, cheating, stealing, dishonesty, deceit, or fraud.  Examples of such specific acts are as follows:

      i.       False statements (about anything oral or written);

      ii.      Use of False Names or Identity;

      iii.     False information on indigency affidavits or in other matters before this or other courts;

      iv.     False information in applications, leases, contracts, or other business dealings;

      v.      False or misleading information provided to prison or jail officials;

      vi.     False testimony in any matter;

      vii.    Acts of adultery or deceit in other family affairs; and/or

      viii.   False information to employers or supervisors, including embezzlement or misuse of company property.

10.    Any and all consideration and promises of consideration given by the government and/or its agents to each witness called by the prosecution.  Any suggestions made by the government or its agents that cooperation could result in favorable treatment of any sort.

11.    Preferential treatment or privileges any informant witness has received as a result of debriefing or agreeing to cooperate, no matter how minimal (e.g. fast food, Starbucks, free

time/rec time, particular unit/cell assignments, additional visiting privileges, etc.).

12.    Any express or implied agreements not to prosecute other persons in exchange for cooperation with the government.

13.    Any evidence of personal bias or animosity of any of the government's informant witnesses toward Torey Vines (or his family/friends), or any of his co-defendants (or any of their family/friends).

14.    Any evidence of personal bias of any of the government's informant witnesses in favor of or against law enforcement or other prosecution witnesses, including:
        i.    History of cooperation with particular law enforcement officers or prosecutors;
        ii.    Prior relationship with other government witnesses, including being housed together at the jail.

15.    False or broken promises by the government's informant witnesses, to government officials, such as:
        i.    Violations of a plea or cooperation agreement (in any respect);
        ii.    If the witness has prior involvement with the criminal justice system, any evidence of violations of bond conditions, violations of pretrial services, and probation revocations, in any fashion, including through drug use or incurring new charges;
        iii.    Failures to Appear based upon written "promise to appear."

16.    Any evidence that informant witnesses have continued to engage in criminal or deceptive conduct while assisting law enforcement in this or any other criminal prosecution or investigation.

17.    Information concerning witnesses' personal problems that affect credibility, including:
        i.    Mental health conditions or intellectual/cognitive impairments;
        ii.    Drug and alcohol abuse history;
        iii.    Medical problems relating to credibility, perception, memory, and observation.

18.    The immigration status of any informant witness who provided material information to the government, as well as any information suggesting concern over potential immigration consequences.

## ARGUMENT

### I.    Jailhouse snitches are unreliable, and so are the convictions they secure.

The United States has seen 190 death row exonerations since capital punishment resumed in

the 1970s.[6]  According to a 2004 report by the Center on Wrongful Convictions, which studied the 111

---

[6] Death Penalty Information Center, "Innocence: List of Those Freed From Death Row," *available at* https://deathpenaltyinfo.org/policy-issues/innocence (last visited July 13, 2023).  Exoneration is defined as when a defendant is subsequently restored to a state of legal innocence. *Id*.  Typically, exoneration occurs when a defendant is acquitted upon re-trial, charges are dropped by the prosecution, or the defendant receives a gubernatorial pardon based on innocence.

death row exonerations that had been identified at that time, "unreliable snitch testimony is the leading cause of wrongful convictions in capital cases."[7]   This Report found that 46% of these innocent Americans had been sentenced to death "based in whole or in part on the testimony of witnesses with incentives to lie," commonly referred to as snitches.[8]   In other words, snitch testimony was a factor in almost half of known wrongful convictions in capital cases.   Similarly, "[i]n more than 15% of cases of wrongful convictions overturned by DNA testing, an informant or jailhouse snitch testified against the defendant" at trial.[9]

"[T]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility."   *On Lee v. United States*, 343 U.S. 747, 757 (1952).   Jailhouse snitches are particularly unreliable, and special precautions must be taken when their testimony is offered.[10]   "Several reports have found that jailhouse informants have a significant incentive to offer testimony against other defendants in order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely fabricated."[11]   These incentives are even greater in serious, high-profile cases.   For example, one 2006 study determined that false convictions are more likely to occur in murder cases than routine criminal cases, possibly due to

---

[7] Center on Wrongful Convictions, *The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row*, at 3 ("*The Snitch System*"), *available at* https://www.aclu.org/other/snitch-system-how-snitch-testimony-sent-randy-steidl-and-other-innocent-americans-death-row (last visited Aug. 26, 2022) (attached as **Attachment D**).

[8] *The Snitch System*, *supra* n.3 (**Attachment D**), at 3.   In contrast, the second leading cause of wrongful convictions in capital cases is erroneous eyewitness identification, present in 25% of cases.   *Id.*

[9] Midwest Innocence Project, "Informants," *available at* http://themip.org/informants (last visited July 13, 2023).

[10] *See, e.g., Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) ("As a general matter, we note that numerous scholars and criminal justice experts have found the testimony by 'jail house snitches' to be highly unreliable."); Daryl K. Brown, Essay, *Rationing Criminal Defense Entitlements: An Argument from Institutional Design*, 104 COLUM. L. REV. 801, 824–25 (2004) (arguing that snitches "presumptively deserve special background investigation in a way other witnesses often do not, even when the state denies a cooperation agreement, and especially if the client's account contradicts the informant's").

[11] *Zappulla*, 391 F.3d at 470 n.3; *see also* State of Illinois, G. Ryan, Governor, *Report of the Governor's Commission on Capital Punishment* (2002) (hereinafter "Ryan Report") (chapter 1 and recommendations attached as **Attachment E**).

circumstances such as the difficulty of investigation, intense pressure to get convictions, and "extreme incentives for the real killers to frame innocent fall guys when they are facing the possibility of execution."[12]

Jailhouse snitches cannot be explained away as "mistakes" or "errors" in the same way that wrongful eyewitness identifications can be.  Willful perjury by informants is a serious problem in our criminal justice system.  In *Zappulla*, for example, the Second Circuit noted that the informant's testimony was "far from credible," as he first learned about the case from an inmate law clerk, received a "generous" cooperation agreement in exchange for his testimony, and admitted that he would "steal, lie, and rob people, even his own family, in order to purchase crack, and in fact, he continued to use and sell drugs while in prison." *Zappulla*, 391 F.3d at 470–71.  Unfortunately, the unsavory nature of the informant in *Zappulla* is perfectly typical of the snitch system.  For example, *The Snitch System* recounts the story of one snitch in Chicago whose own mother testified that he had a bad reputation for honesty, and yet he received cash and his release in exchange for his testimony against three men, all of whom received life sentences.[13]

Similarly, in 1999, the *Chicago Tribune* published a five-part series entitled "The Failure of the Death Penalty in Illinois."  The third part of the series, entitled "The Inside Informant," documented abuses of the snitch system in Illinois.[14]  The paper told the story of Tommy Dye, who "lies about almost everything, even his own name," and who has been documented as lying under oath.  Nonetheless, Dye's testimony was the centerpiece of the capital murder trial that put Steven Manning, a former Chicago police officer, on death row.  The paper went on to report that in Illinois, "at least 46 inmates have been

---

[12] Samuel Gross, et. al., *Exonerations in the United States 1989 Through 2003,* 95 J. Crim. L. & Criminology 423, 531–33 (2006) (a copy of this article is attached as **Attachment F**).

[13] *See The Snitch System*, *supra* n.3 (**Attachment D**) at 2, 13.

[14] Steve Mills & Ken Armstrong, "The Inside Informant," *Chicago Tribune*, Nov. 16, 1999 at 1 (a copy of this article is attached as **Attachment G**).

sent to death row in cases where prosecutors used a jailhouse informant," and in approximately "half of those cases, the informant played a significant role in the conviction."[15]

The *Tribune* also reported on the ease with which informants "can glean details of a crime from newspapers or another inmate's legal papers and stitch them together into a compelling confession." For example, one Los Angeles snitch, Leslie Vernon Vines, "was such a prolific jailhouse informant that in 1988 he demonstrated for jailers how simple it was to concoct a confession and convince prosecutors it was genuine." Vines used the jail phone to pose as an official and get information, and "then falsified jail records to show that he had shared a cell with the suspect."[16]  Similarly, "Willie Williams, a three-time felon, testified he read newspaper accounts of the 1988 slayings of five people on Chicago's South Side before he contacted police to report that a friend" had confessed to the killings.  Still, Williams was a key witness in the case against his "friend," who was still on death row at the time of the article.[17] All in all, "[t]he experience shows pretty much what you would expect—that when the criminal justice system offers witnesses incentives to lie, they will."[18]

At least partly in response to the series in the *Chicago Tribune*, then-Governor George Ryan ordered a comprehensive review of the administration of the death penalty in Illinois, resulting in the Ryan Report.  "[I]t takes only a cursory reading of the [Ryan] Report to recognize that it describes men released who were demonstrably innocent or convicted on grossly unreliable evidence." *Kansas v. Marsh*, 548 U.S. 163, 208 n.2 (2005) (Souter, J., dissenting).  The Ryan Report included eighty-five

---

[15] *Id.*

[16] *Id.* As a result of the high-profile informants such as Leslie Vines, Oklahoma's state high court "set up a system to screen informants before they testify at trial."  In Oklahoma, prosecutors are required to "disclose an informant's criminal background, any deal they have made with him, the alleged confession he obtained and all other cases in which the informant played a similar role—no matter how minor."  Additionally, trial courts "now must conduct a separate pretrial hearing on the snitch's reliability" and "also must instruct jurors to be wary of these witnesses." *Id.*

[17] *Id.*  Williams's "friend," Ronald Kitchen, has since been exonerated, but only after twenty-one years in prison, thirteen of which were on death row. *See* The National Registry of Exonerations, "Ronald Kitchen," available at http://www.law.umich.edu/special/exoneration/pages/casedetail.aspx?caseid=3355 (last visited Aug. 26, 2022); *see also* Matthew Walberg, "Ronald Kitchen sues Daley, Burge for wrongful conviction," *Chicago Tribune* (July 1, 2010).  Had Governor Ryan not commuted Illinois's 167 death sentences as a result of the Ryan Report, Kitchen would have been executed on the basis of Williams's false snitch testimony.

[18] *The Snitch System*, *supra* n.3 (**Attachment D**), at 2.

recommendations designed to make it less likely that an innocent person would be sentenced to death. Among other things, the Report recommended that police, prosecutors, capital case defense attorneys, and judges receive periodic training on the "risks of false testimony by in-custody informants."[19]

The Ryan Report also made three specific recommendations as to how snitch testimony should be handled in pretrial proceedings.  First, Recommendation 50 would "require that any discussions with a witness or the representative of a witness concerning benefits, potential benefits or detriments conferred on a witness by any prosecutor, police official, corrections official or anyone else should be reduced to writing, and should be disclosed to the defense in advance of trial."  Second, Recommendation 51 would require that when the prosecution "may introduce testimony of an in-custody informant who has agreed to testify for the prosecution in a capital case to a statement allegedly made by the defendant, at either the guilt or sentencing phase, the state should promptly inform the defense as to the identification and background of the witness."  And third, Recommendation 52 would require a pretrial "evidentiary hearing to determine the reliability and admissibility of the in-custody informant's testimony."[20]  This pretrial hearing would require the prosecution to prove the witness's reliability by a preponderance of the evidence in light of the specific statements attributed to the defendant, circumstances of the alleged statements, "[a]ny deal or inducement," the witness's criminal history, previous recantations or snitch testimony, and "[a]ny other known evidence that may attest to or diminish the credibility of the witness."[21]  In response to these recommendations, the State of Illinois enacted legislation mandating such a reliability hearing before the prosecution could introduce the testimony of an informant, and requiring the pre-trial disclosure of relevant information regarding the informant, including "[o]ther cases in which the informant testified, provided that the existence of such

---

[19] Ryan Report, **Attachment E**, at 21, 27–28.
[20] *Id.* at 30.

[21] *Id.* at 31.

testimony can be ascertained through reasonable inquiry and whether the informant received any promise, inducement, or benefit in exchange for or subsequent to that testimony or statement."[22]

## II. Cross-examination alone is ineffective at ensuring reliability.

Courts traditionally permitted jailhouse snitches to testify on the assumption that cross-examination adequately tested their truthfulness.[23] But cross-examination, no matter how rigorous, is fundamentally insufficient as a safeguard against false informant testimony for a number of reasons, including (1) the ability of lying informants to stave off or preclude corroboration or rebuttal, (2) unequal access to the informant, and (3) the incentive structures created by testimony-for-benefit, especially in high-stakes cases.

*First*, skilled informants know to tell stories that cannot be corroborated or rebutted. "Accomplices can manipulate their versions of events without arousing much suspicion precisely because they are immersed in the details of the crime and know which aspects of the enterprise are verifiable and which are not."[24] *Second*, there is the problem of access.  Historically, the defendant did not have access to the informant until trial, limiting his ability to prepare for testimony or investigate his credibility.   The government, meanwhile, has routine and regular access; they can debrief informants whenever they please, prepare them for cross-examination, and consult with them about the details of the informant narrative, including its strengths and weaknesses.  As a result of unequal access, the government is frequently overprepared for informant testimony, while the defense is not prepared at all.  *Third*, there is the problem of incentives.  The prosecution has a significant incentive to protect the informant and ensure he is insulated from effective cross-examination.  Of course, this is

---

[22] *See* 725 Ill. Comp. Stat. 5/115-21.

[23] *See e.g. Hoffa v. United States*, 385 U.S. 293, 311 (1966) ("The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.").

[24] "Paradoxically, the more a witness's fate depends on the success of the prosecution, the more resistant the witness will be to cross-examination.  A witness whose future depends on currying the government's favor will formulate a consistent and credible story calculated to procure an agreement with the government and will adhere religiously at trial to her prior statements." George C. Harris, *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 PEPP. L. REV. 1, 54 (2000).

true of many trial witnesses, but it is amplified in the informant context, where the prosecution has bound its case to the word of someone who very well might lie.  The informant shares the government's interests, but for different reasons, rooted in his self-interest.[25]

### III.       Prosecutorial discretion is also an insufficient safeguard.

The second traditional safeguard against false informant testimony is prosecutorial discretion. The prosecutor, as the representative of the sovereign, has an ethical obligation not merely to seek a conviction, but ensure that the defendant is given a fair trial.  *Kyles v. Whitley*, 514 U.S. 419, 439–40 (1995) (the government's interest "is not that it shall win a case, but that justice shall be done").  A significant component of this obligation is the requirement that the government adduce only truthful, reliable testimony.  Unfortunately, relying on a party in an adversarial process to identify, scrutinize, and discard as unreliable evidence that might otherwise establish guilt provides little protection to defendants.

Consistent with the prosecutor's obligation to seek justice, not merely conviction, courts have held that due process requires prosecutors to be exceedingly wary of testimony provided for benefit or hoped-for benefit.  More so than with almost any other type of witness, the prosecutor is in a unique position to assess the reliability of informants, since it is the government who enlists, controls, and rewards them.  A "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system [and courts] expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery."[26]

---

[25] R. Michael Cassidy, *"Soft Words Of Hope:"* Giglio*, Accomplice Witnesses, and the Problem of Implied Inducements*, 98 Nw. U. L. Rev. 1129, 1140 (2004) (noting that prosecutors report that "[a]ccomplice witnesses are very eager to please the government, precisely because they perceive that their future liberty and safety depend on it").

[26] *Commonwealth of the Northern Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001); *see also United States v. Levenite*, 277 F.3d 454, 459-62 (4th Cir. 2002).

For a number of reasons, however, even prosecutors who are vigilant about these perils[27] have a very hard time distinguishing what is true from what is false, making it difficult for them to guarantee the reliability of informant witnesses. First, as noted above, there is the problem of informant incentives. The objective of a lying informant is to evade detection; any hope of leniency, of course, rests on his ability to provide the government with useful information. Pleasing the prosecutor is the informant's only hope for benefit. If the witness is lying, the prosecutor will be last person to whom he will admit his lie.[28]

---

[27] Many prosecutors, including former attorneys general and the Department of Justice, recognize "the perils of using rewarded criminals as witnesses." For example, former U.S. Attorney General Edward H. Levi, in promulgating new guidelines for use of informants by law enforcement in federal cases noted that the practice

> may require government cooperation with persons whose reliability and motivation may be open to question, [and therefore] should be carefully limited. Thus . . . it is imperative that special care be taken not only to minimize their use but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law.

*Att'y. Gen'l. Guidelines for FBI Use of Informants in Domestic Security, Organized Crime and Other Crim. Investigations* (Dec. 15, 1976), in *FBI Oversight: Hearings Before the Subcommittee on Civil and Const. Rights of the House Oversight Committee on the Judiciary*, 95th Cong., 1st Sess. 50–53. Elsewhere, in guiding prosecutors on the use of informants, the Department of Justice admonished that:

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law. This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies, and doublecrossing anyone with whom they come into contact, including—and especially— the prosecutor. A drug addict can sell out his mother to get a deal; and burglars, robbers, murderers, and thieves are not far behind. They are remarkably manipulative and skillfully devious. Many are outright conscienceless sociopaths to whom `truth' is a wholly meaningless concept. *To some, 'conning' people is a way of life. Others are just basically unstable people. A 'reliable informant' one day may turn into a consummate prevaricator the next.*

U.S. Dept. of Justice, *Prosecution of Public Corruption Cases* at 117–18 (Feb. 1988) (emphasis added) (The relevant excerpt of this Report is provided as **Attachment H**).

[28] Some prosecutors, of course, are aware of this, and are more candid than one might expect in admitting it. In a 1999 Fordham Law Review article, one prosecutor noted that "'[i]t is not that [the cooperator] thinks he's fabricating information[;] [h]e's just eager to please.'" Ellen Yaroshefsky, *Cooperation with Federal Prosecutors: Experiences of Truth Telling and Embellishment*, 68 FORDHAM L. REV. 917 (1999). Another took a more cynical view: "Many [cooperators] come in believing This Is What They Want To Hear Time rather than This Is What Happened Time. Thus, the last thing you want to do is to feed them information because they will believe you want them to parrot back that information." *Id.* at 955.

Prosecutors have their own reasons to overlook questions about a snitch's credibility. Despite their general awareness that informants lie, prosecutors are under pressure to use them to secure convictions, especially in serious, high-profile cases such as this one. Barry Tarlow, a former prosecutor, noted in a *Champion* article the heavy pressures on prosecutors to rely on unreliable compensated witnesses when others are unavailable.[29] "[E]ven 'virtuous,' 'conscientious,' and 'prudent' prosecutors fall prey to cognitive failures."[30] Of course, confirmation bias is a phenomenon that affects almost everybody. People naturally tend to view information that reinforces their existing beliefs favorably, and therefore seek out consonant evidence while being resistant to contrary evidence. The fact that prosecutors are often under intense pressure to obtain convictions only makes them more vulnerable to believing a lying informant who tells them a story they want to hear.

Mere awareness of the reliability concerns inherent in snitch testimony is insufficient to stop most prosecutors from using such testimony. In fact, "most prosecutors candidly admit that they are aware of instances in which cooperators have lied and the lies have gone undetected long enough to have an impact on the investigation."[31] But instead of making most prosecutors leery of using snitch witnesses, the fact that snitches are inherently unreliable creates a perverse incentive for prosecutors to shield themselves from the facts that would call the witness's veracity into question. By choosing to believe that "this snitch is the honest snitch," prosecutors can preserve the witness's credibility for trial, avoid *Brady* disclosures, and create plausible deniability in the event that the story falls apart.

Lastly, there is a more general reason that prosecutorial discretion has failed to curb false snitch testimony: human beings are terrible lie detectors. Research consistently indicates that the average person attempting to make a truthfulness determination is only accurate about 55 percent of the time,

---

[29] *See* Barry Tarlow, "Perjuring Informants Brought to the Bar," RICO Report, *Champion* 33–40 (July 2000).

[30] Alafair S. Burke, *Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science*, 47 Wm. & Mary L. Rev. 1587, 1596–97 (2006).

[31] Steven M. Cohen, *What Is True? Perspectives of a Former Prosecutor*, 23 Cardozo L. Rev. 817, 824 n.16 (2002).

"barely better, statistically, than flipping a coin."[32]  This is true of humans as a rule, even those who

trade in discerning truth from falsity, such as police and judges.[33]

IV.    **To safeguard against the dangers of false snitch testimony, the government should be required to provide adequate pre-trial notice of its intent to use any such witnesses and take extraordinary measures to ensure that impeachment evidence does not go undiscovered.**

As case law and commonsense both indicate, if an individual is convicted upon snitch testimony,

the error is difficult to correct.[34]  "Prosecutors, defense lawyers, judges, and citizens . . . throughout the

United States, have very recently been educated to understand that the risk that a defendant might be

unfairly convicted and/or sentenced to death is not merely theoretical."[35]  This risk is most severe,

however, when the prosecution relies on the testimony of snitches and confidential informants.

Requiring the government to provide ample discovery and allowing the defense to conduct meaningful

investigation will increase the reliability and fairness of these proceedings.

It is "myopic" to focus solely on the whether or not the government has made a "deal" with a

jailhouse informant witness.  *Harshman v. Superintendent*, 368 F. Supp. 3d 776, 790 (M.D. Pa. 2019).

In addition to "deals" and "agreements," *Brady v. Maryland* and other firmly established Supreme

Court precedents require the disclosure all evidence that is "favorable to the accused."  *Id.*[36]  This

includes "impeachment evidence regarding favorable treatment or even the possibility or expectation

---

[32] Saul M. Kassin, *Human Judges of Truth, Deception, and Credibility: Confident But Erroneous*, 23 CARDOZO L. REV. 809, 810 (2002).

[33] *See* Paul Ekman & Maureen O'Sullivan, *Who Can Catch a Liar?*, 46 AM. PSYCHOLOGIST 913, 913–17 (Sept. 1991) (provided as **Attachment I**) (during controlled experiment, trial judges performed only slightly better than chance in determining who was lying).

[34] *See, e.g.*, *supra* note 13 and accompanying text (discussing the case of Ronald Kitchen, who was incarcerated over twenty years and nearly executed based on snitch testimony); *United States v. Anderson*, 260 F. Supp. 2d 310, 316 (D. Mass. 2003) ("As Justice Stewart emphasized, if an individual is executed because a jury had inaccurate or incomplete information, the error cannot be corrected."); *Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010) (granting habeas relief to an innocent man convicted of ten murders based on testimony of single snitch after twenty-six years imprisonment despite the snitch's "long and public history of dishonesty").

[35] *See, e.g.*, *Anderson*, 260 F. Supp. at 316 n.4.

[36] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972), *Strickler v. Greene*, 527 U.S. 263 (1999), *United States v. Bagley*, 473 U.S. 667 (1985); *Kyles*, 514 U.S. at 419.

of favorable treatment." *Harshman*, 368 F. Supp. 3d at 790 (citing *Giglio*, 405 U.S. at 154–54).[37]  It includes "evidence that impugns the reliability of the witness's testimony." *Id.* (citing *Kyles*, 514 U.S. at 441–45).[38]  It also includes "evidence of bias, prejudice, or ulterior motives affecting the witness's credibility." *Id.*[39]  Each of the requests made in the instant motion falls into at least one of these categories.

Even if any of the requested disclosures did not fit neatly into one of the foregoing categories, it is still within the Court's authority to require the government to disclose the existence of the additional information requested prior to trial.  The United States Supreme Court has held that "the trial court may require disclosure" of informant identity information "[w]here the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957).  In determining whether to order disclosure, the Court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62.  In this case, the information requested is clearly relevant and will be helpful to the defense.  Without the requested disclosures, defense counsel will be unable to fulfill their constitutional duty to conduct a thorough investigation of merits-phase issues.[40]

Although some of Mr. Vines's specific requests may be unfamiliar to the government, the notion that a prosecutor must obtain additional information in response to a *Brady* request is by no means novel.  The government's obligation extends beyond what is contained in its file, to all information, in

---

[37] The requests made in paragraphs 1, 4, 7, 8, 10, 11, 12, 14, 16, and 18 of the accompanying Motion fall into this category.

[38] The requests made in paragraphs 1, 2, 3, 5, 6, 7, 8, 9, 15, 16, and 17 of the accompanying Motion fall into this category.

[39] The requests made in paragraphs 1, 4, 7, 8, 10, 11, 12, 13, 14, 15, 16, and 18 of the accompanying Motion fall into this category.

[40] *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7(A) (2003); *see also* Commentary to Guideline 10.7(A) (stating "[u]nfortunately, inadequate investigation by defense attorneys—as well as . . . false jailhouse informant testimony . . .—have contributed to wrongful convictions in both capital and non-capital cases").  These ABA Guidelines have repeatedly been invoked by the United States Supreme Court as "guides to determining what is reasonable" in evaluating the constitutional effectiveness of defense counsel. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

any form, known by all law enforcement or other government agencies involved in this case, whether or not personally known to the individual prosecutor.[41]  The government is not a passive recipient of information, but rather an active participant in investigating and assessing the strength and reliability of its evidence.  It must not only turn over what it has, it must also collect the information it lacks to ensure the reliability of an informant witness.  It must seek to corroborate and verify testimony, procure evidence that establishes (or diminishes) its claims, and inquire of all law enforcement agencies involved to ensure that both the prosecution and defense have access to the information required to ensure a fair proceeding and an adequate defense.

Finally, if the prosecution intends to use snitch testimony, disclosure should be made well in advance of trial so that the defense can litigate issues regarding the reliability of that testimony and the potential witness's incentives and opportunities to fabricate testimony.  All parties, the Court, and the public share an interest in ensuring that this trial will be free of the type of false informant testimony that has marred so many other prosecutions.

## CONCLUSION

The disclosures requested herein are designed to facilitate investigation of information that is far more easily obtainable by the prosecution.  Mr. Vines's case is well known in the jail and in the community and is exactly the type of case in which snitches commonly fabricate confessions in an attempt to gain incentives from prosecutors.  If the government chooses to rely at least partially upon a notoriously unreliable type of evidence, the Court should require the prosecution to take extraordinary precautions against false testimony.

---

[41] "Agents" include any department or agency of the government or its political subdivisions and any and all other law enforcement departments and agencies of the United States, the individual States, and any political subdivision thereof that assisted or participated in the investigation of this matter. See *Kyles*, 514 U.S. at 437 (the individual prosecutor has a duty to learn of any *373* material known to others acting on the government's behalf, including the police); see also *Strickler v. Greene*, 527 U.S. 263, 275, n.12 (1999) (prosecutor is responsible for all favorable evidence known to those acting on the government's behalf).  The prosecution is responsible for any failure to disclose information, and it makes no difference if it was withheld deliberately, or inadvertently because of a simple failure to obtain it.  *Kyles*, 514 U.S. at 437.

Respectfully submitted,
Marcel Vines
By Counsel

/s/ Joseph T. Flood
Sheldon & Flood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 251-0757 (fax)
jflood@sfhdefense.com

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C., 20006
(202) 462-1100
pleasant.brodnax@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing motion was filed by CM/ECF on this the 14th day of July 2022, which will then send a notification to counsel of record.

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III