UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 19-cr-00166 (DLF) |
| | : | |
| MARCEL VINES and | : | |
| MALIQUE LEWIS, | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT VINES' MOTION TO SUPPRESS CELL SITE DATA AND IDENTIFICATION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby opposes defendant Marcel Vines' Motion to Suppress Cell Site Data and Identification by W-2 (ECF 135). Defendant Vines argues that the affidavit in support of the cell site warrant contains materially false statements because it relies on W-2, "who does not exist, was manifestly incredible, or his/her alleged identification is [sic] the product of an unduly suggestive identification procedure." ECF 135 at ¶ 10. Significantly, the individual referred to as W-2 in the affidavit in support of the search warrant seeking defendant Vines' cell site data is co-defendant Ashton Briscoe, a fact that the government specifically clarified in a footnote in its June 13, 2019 discovery letter. *See* ECF 22, Attach. n.3. To that end, there is no evidence of any false statements in the search warrant affidavit. Moreover, Briscoe was friends with Vines, was arrested with him, and, indeed, admitted to committing at least one murder with him. Thus, the use of a confirmatory identification procedure was not unduly suggestive, and in any event Briscoe's identification was reliable. Accordingly, defendant Vines' motion is baseless, does not present an actionable issue for a hearing, and should be summarily denied.

## PROCEDURAL AND FACTUAL BACKGROUND

The defendants are charged with two counts of Kidnapping Resulting in Death and Aiding and Abetting, in violation of 18 U.S.C. § 1201(a)(1) and § 2, Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c), two counts of Kidnapping while Armed and Aiding and Abetting, in violation of 22 D.C. Code §§ 2001, 4502, two counts of First Degree Murder while Armed—Felony Murder (Aggravating Circumstances), and First Degree Murder While Armed (Premeditated) (Aggravating Circumstances), in violation of 22 D.C. Code §§ 2101, 4502, 2104.01(b)(1), and 1805, and several counts of firearms offenses associated with the kidnappings and murders.  All these charges relate to the defendants' armed kidnapping of Armani Coles and Kerrice Lewis on December 28, 2017, that ultimately concluded later that day in the murder of both kidnapping victims.

    *A.*    *The Kidnappings and Murders*

The events began on December 28, 2017, at approximately 11:15 a.m., when Dennis Whitaker was sitting in the driver's seat of his car in a parking lot in the Clay Terrace neighborhood in Northeast, Washington, D.C.  Defendants Ashton Briscoe and Vines, along with Ronzay Green and another individual, approached Whitaker's car with the intent to rob him.  Notably, Whitaker was not from Clay Terrace.  Briscoe and Vines, however, along with Ronzay Green, were all close friends who hung out in and frequented the Clay Terrace neighborhood daily.  Defendant Vines had life-long ties to the area.

As his friends approached Whitaker's car with firearms, Green entered the front passenger seat of Whitaker's car and began talking to Whitaker.  While doing so, Green sent a text message to Briscoe to tell another individual (hereinafter "Male 1") to "block [Whitaker] in" with his

2

vehicle.[1]  As Briscoe and Vines, both of whom were armed with firearms, approached Whitaker's car, Male 1 drove into the parking lot towards Whitaker's car.  Before they could complete the robbery, however, Whitaker fled in his car with Green in the front passenger seat.

A few moments later, using FaceTime, Green contacted Briscoe.  Briscoe recognized the 7-Eleven located in the 900 block of Eastern Avenue Northeast, in the background of Green's camera.  Briscoe, Vines, and Male 1 drove to the 7-Eleven to pick-up Green.  When they arrived, they saw Green lying on the ground in the parking lot suffering from an apparent gunshot wound inflicted by Whitaker.  Indeed, police had received calls for a shooting at the 7-Eleven at approximately 11:20 a.m.  After determining that Green was still breathing, the group returned to Clay Terrace to store their guns.  Vines then left to go back to the 7-Eleven, where he was captured by first responding officers' Body Worn Cameras at 11:25 a.m., hunched over Green's body.  At the same time, Vines called Briscoe, who, shortly thereafter, called defendant Malique Lewis, another close friend with life-long ties to Clay Terrace and who frequented the neighborhood daily.

Green was taken to Prince George's County Hospital.  Defendants Vines and Lewis were present at the hospital when the doctors informed the family at approximately 11:58 a.m. that Green had died.  While still at the hospital, Vines and Lewis made statements to the effect that "somebody got to pay for this."  After Green died, defendant Lewis called Briscoe and told Briscoe that Green had died from his injuries.  Soon thereafter Vines and Lewis arrived back in Clay Terrace in a car driven by another individual (hereinafter "Male 2").[2]  Briscoe entered the vehicle, and Male 2 drove Briscoe, Lewis, and Vines from Clay Terrace to First and Kennedy Streets

---

[1]     Male 1, who is known to law enforcement, was also a close friend of the defendants and Green, has life-long ties to Clay Terrace, and frequented the neighborhood daily.
[2]     Like Male 1, Male 2 is known to law enforcement, and was a close friend of the defendants.  He similarly frequented the Clay Terrace neighborhood several times a week.

3

Northwest, Whitaker's neighborhood.  The three defendants were all armed with firearms.  Their intent in traveling to First and Kennedy Streets was to locate and kill Whitaker in retaliation for Whitaker killing Green after the botched robbery earlier that day.

When Lewis, Vines, Briscoe, and Male 2 arrived in the Kennedy Street neighborhood, they did not locate Whitaker.  However, they observed Ms. Kerrice Lewis at a gas station putting gas in her blue Lexus and recognized her as a good friend of Whitaker.  Believing that Ms. Lewis could lead them to Whitaker, the defendants followed Ms. Lewis.  Ms. Lewis arrived at an AutoZone on Kennedy Street Northwest, Washington, D.C., and the defendants watched as Ms. Lewis parked her car in the parking lot and entered the store.  Once Ms. Lewis entered the AutoZone, Vines and Lewis exited Male 2's vehicle and found Ms. Lewis' Lexus unlocked.  Intending to use Ms. Lewis to find Mr. Whitaker, Vines and Lewis entered the back seat of Ms. Lewis' car and ducked out of view, lying-in-wait for her to reenter the car.

Ms. Lewis exited the AutoZone, got into the driver's seat of her car, and began to drive out of the AutoZone parking lot.  As she did, Vines and Lewis raised themselves into view from the back seat and at least one of them pointed their weapon at Ms. Lewis.  Vines and Lewis forced Ms. Lewis at gun point to drive to a nearby alley and then forced Ms. Lewis into the back seat of her car. Defendant Lewis drove Ms. Lewis' Lexus away from the alley while Vines kept his gun trained on Ms. Lewis from the front passenger seat.  Vines and Lewis took Ms. Lewis to an apartment complex near Hawaii Avenue where they believed Whitaker would be located.  When that did not materialize, defendants Lewis and Vines drove Ms. Lewis towards Clay Terrace.

Defendants Lewis and Vines drove the Lexus into an alley off 58th Street Southeast. Defendant Lewis got out of the car and advised Briscoe, who had followed Lewi and Vines to 58th

Street, that Ms. Lewis was not being truthful with them, and that they were "going to leave her here." In other words, that they were going to kill Ms. Lewis.

When defendant Lewis returned to the Lexus, however, he drove out of the parking lot with Ms. Lewis in the back seat and Vines still holding her at gun point. While driving, defendant Lewis called Briscoe and told him that they were going back to the area of First and Kennedy Streets Northwest. Lewis explained that they had texted with another close friend of Ms. Lewis and Whitaker, later determined to be Mr. Armani Coles, from Ms. Lewis' phone and Mr. Coles was going to meet them around First and Kennedy Streets Northwest. The defendants expected that Mr. Coles could lead them to Whitaker.

When they arrived, defendant Lewis drove the Lexus into an alley off First Street Northwest, Washington, D.C. A few moments later, defendant Lewis met Briscoe near Longfellow Street Northwest, and provided Briscoe with a pair of keys to Mr. Cole's Toyota Camry, which was parked on First Street. Defendant Lewis told Briscoe to drive the Camry back to the same alley on 58th Street where they had taken Ms. Lewis, and they would meet him there. Vines and Lewis confined Ms. Lewis to the trunk of her Lexus and forced Mr. Coles into the backseat of the Lexus. They then drove towards 58th Street Southeast.

Defendant Lewis, with Ms. Lewis confined to the trunk of her own vehicle and Mr. Coles confined to the backseat at gunpoint, merged the Lexus southbound onto Maryland Route 201, towards the Anacostia Freeway and I-295, and entered Maryland. As they approached the Eastern Avenue exit, located in Bladensburg, Maryland, they encountered slow-moving traffic. During this time, at approximately 6:20 p.m., Mr. Coles attempted to escape from the backseat of the Lexus. In response, Vines and Lewis shot Mr. Coles in the chest and abdomen. They then pushed

his body onto the side of the highway and continued onto the Eastern Avenue exit, reentering Washington, D.C.  Mr. Coles died from the gunshots inflicted by Vines and Lewis.

After shooting Mr. Coles and discarding his body, Vines and Lewis contacted Briscoe and told him to meet them in the Kenilworth neighborhood of Northeast, Washington, D.C.  Briscoe, who was driving Mr. Coles' Toyota Camry, did so.  Upon meeting, Briscoe then followed Vines and Lewis, who were still driving Ms. Lewis' Lexus with Ms. Lewis confined in the trunk, to an alley off the 800 block of Adrian Street Southeast, Washington, D.C., at about 7:18 p.m., and parked.  Briscoe parked Mr. Coles' Camry at the end of the alley, and Vines parked Ms. Lewis' Lexus behind the Camry.  Vines and Lewis exited the Lexus and walked to the trunk.  They opened the trunk and fired their weapons into the trunk, where Ms. Lewis was trapped.  After doing so, one of the defendants shot into the passenger compartment of the Lexus, and the Lexus erupted in flames.  Vines and Lewis then entered Mr. Coles' Toyota Camry and Briscoe drove them away.  Ms. Lewis died from the gunshot wounds inflicted by Vines and Lewis.

B.    *The Arrests*

Defendants Vines, Lewis, and Briscoe were all arrested on January 4, 2018 in Washington, D.C.  Vines and Briscoe were both arrested in the same apartment in the Clay Terrace neighborhood.  Defendant Lewis in Southwest Washington, D.C.  Notably, none of the defendants were arrested for the instant murders.  Rather, Vines had an outstanding arrest warrant for armed robbery.  He was charged with armed robbery in D.C. Superior Court and was detained pending trial.[3]  Defendants Briscoe and Lewis also had outstanding arrest warrants originating out of Prince George's County (hereinafter "PG County") for an armed robbery.  Both Lewis and Briscoe waived extradition to Maryland, where they were charged as co-defendants with armed robbery

---

3    Defendant Vines was later acquitted at trial of the robbery charges.

by the PG County States Attorney's Office. Shortly thereafter, the PG State's Attorney also charged defendant Lewis with the murder of Mr. Coles and he was detained pending trial.

On January 9, 2018, after being extradited to Maryland, defendant Briscoe agreed speak with MPD Detective Brian Wise about the murders of Ronzay Green, Kerrice Lewis, and Armani Coles.[4] During that interview, Briscoe initially denied knowing anything about the murders, but admitted that he did hang out in Clay Terrace and had become friends with many people from Clay Terrace because he had gone to H.D. Woodson High School with them, including Malique Lewis.[5] Briscoe also admitted that he knew Marcel Vines from being around Clay Terrace, but that Vines had been incarcerated when Briscoe first began hanging around Clay Terrace and was just released in November 2017.

As the interview went on, Briscoe admitted to some involvement in the murder of Kerrice Lewis but minimized that involvement. He told detectives that he was in Clay Terrace when Freak gave him the keys to a black Toyota and instructed Briscoe to use the Toyota to follow Freak, who was in a Lexus. Briscoe reported that Freak led him to an alley, and when they arrived, he pulled the black Toyota in front of the Lexus and parked. According to Briscoe, he then heard multiple gunshots and saw Freak and an individual he referred to as "B.Y.," one of Freak's friends, running towards the black Toyota. Freak entered the front passenger seat carrying a black gun with him, and B.Y. entered the rear driver's side behind Briscoe. Briscoe admitted that he then drove Freak and B.Y. away from the alley to Clay Terrace. Briscoe stated that he knew someone was in the Lexus with Freak but did not know it was B.Y. until B.Y. got into the Toyota. When asked to describe B.Y., Briscoe indicated that B.Y was a black male whose complexion was a little darker

---

[4]   PGPD Detectives Tyler and Reed also participated in the interview at various times.
[5]   Throughout the interview, Briscoe referred to defendant Lewis as both "Malique" and "Freak."

than his own, and who was approximately 5'5" in height with a short haircut. Briscoe told detectives that he had B.Y.'s phone number saved in his phone and provided the detectives with that number. Briscoe reported that B.Y. and he had been arrested together on January 4, 2018, and that B.Y. had been staying a half-way house, but never went back after Green was killed. When shown a single photograph of Marcel Vines, Briscoe stated "that's B.Y."

Two days later, on January 11, 2018, Detective Wise obtained Superior Court Search Warrant number 2018CSW274 to obtain defendant Vines' cell site data. The affidavit in support of the search warrant (hereinafter "the Affidavit"), recounted the murder of Green by Whitaker, Green's association with Clay Terrace, Mr. Coles' and Ms. Lewis' association with Whitaker, the temporal proximity of Mr. Coles' and Ms. Lewis' murders, and that at least one of the firearms used to kill Mr. Coles was also used to kill Ms. Lewis. *See* Exhibit 1. In addition, the Affidavit provided information about the recovery of Mr. Coles' Toyota Camry in the Clay Terrace neighborhood on January 2, 2018, just five days after Mr. Coles' murder, and explained how a McDonald's receipt recovered from the Camry led law enforcement to surveillance footage of defendant Lewis driving Mr. Coles' Camry in the drive-through lane of a McDonald's on December 29, 2017, one day after the murders. The Affidavit went on to describe defendant Lewis' association with Clay Terrace and his relationship with Ronzay Green. The observations of Ashton Briscoe (W-2) from his interview with Detective Wise on January 9, 2018 were also presented in the Affidavit, including his identification of defendant Vines. Defendant Briscoe's observations were corroborated in large part by the observations of W-1 and surveillance video from the alley in which Ms. Lewis was killed, both of which were discussed in the Affidavit. Finally, the Affidavit described the cell phone contact between Vines and defendant Lewis, and

8

how defendant Lewis' cell phone had used cell towers in the vicinity of both murders at the time of both murders.

On February 10, 2018, PG County released Briscoe from custody and he was promptly rearrested that same day in D.C. on an arrest warrant for the murder of Kerrice Lewis.[6]  He was charged by Complaint in D.C. Superior Court with First Degree Murder While Armed.  On August 23, 2018, defendant Vines was charged in D.C. Superior Court with two counts of First Degree Murder While Armed for the murders of Armani Coles and Kerrice Lewis.  Less than a week later, on August 29, 2018, the case against defendant Lewis in PG County for the murder of Mr. Coles was dismissed, and he was charged in D.C. Superior Court with two counts of First Degree Murder While Armed for killing both Mr. Coles and Ms. Lewis.[7]  On May 17, 2019, a federal grand jury indicted Defendants Vines, Lewis, and Briscoe on two counts of Kidnapping Resulting in Death.  On June 28, 2019, a federal grand jury returned the current superseding indictment.

## ARGUMENT

I. DEFENDANT VINES HAS FAILED TO ESTABLISH THAT THE AFFIDAVIT CONTAINS MATERIALLY FALSE STATEMENTS AND HE IS NOT ENTITLED TO A HEARING ON THE ISSUE

A defendant seeking to suppress evidence under *Franks v. Delaware*, 438 U.S. 154 (1978), must show: (1) that the affidavit supporting the search warrant contained false statements; (2) that the false statements were material to the issue of probable cause; and (3) that the false statements were made knowingly and intentionally or with reckless disregard for the truth.  438 U.S. at 155-

---

[6]   Defendant Briscoe agreed to a second interview with Detective Wise after his arrest for the murder of Kerrice Lewis.  In that interview, Briscoe provided information largely consistent with his January 9 interview, but admitted that he learned about the plan to rob Whitaker shortly before it occurred.

[7]   It is the government's understanding that Defendant Lewis' charges stemming from the December 18, 2017 robbery were also dismissed by PG County.

9

56; *United States v. Dorman*, 860 F.3d 675, 684 (D.C. Cir. 2017); *United States v. Richardson*, 861 F.2d 291, 293 (D.C. Cir. 1988). "This reasoning applies as well to material omissions," where material "means that the inclusion of the omitted information in the affidavit would defeat probable cause." *Dorman*, 860 F.3d at 684 (internal quotation marks and citations omitted). To merit a hearing, a defendant must make a "threshold showing" that the affidavit is false in some material respect. *Franks*, 438 U.S. at 171. That showing:

> must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portions of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Id.*; *see also United States v. Gaston*, 357 F.3d 77 (D.C. Cir. 2004) (allegations not sufficiently specific to warrant *Franks* hearing). Defendant Vines' motion fails to make a threshold showing and he is not entitled to a hearing.

Applying the *Franks* test to the instant matter, Vines has failed to make the requisite showing that would warrant an evidentiary hearing. Defendant Vines bases his claim for relief entirely on the mistaken assumption that W-2 is unknown to him and challenges whether W-2 even exists. *See* Def. Mot., ECF 135 at ¶¶ 9-10. Yet, the defendants were provided with the identity of W-2 over four years ago. In correspondence dated June 19, 2019, the government disclosed that as it pertains to "this [Affidavit] only, the individual identified as W-2 refers to Mr. Briscoe." *See* ECF 22, Attach. n.3. Moreover, on July 12, 2019, the government provided defendants Vines and Lewis with a copy of defendant Briscoe's videotaped January 9 interview with Detective Wise in which Briscoe identified both defendants as participating in the murder of Kerrice Lewis.

Considering this, Vines' expressed confusion as to the identity of W-2 is itself puzzling  *See* Def. Mot., ECF 135 at ¶ 5.

His confusion notwithstanding, Vines' claim must fail because he has not established the first prong of the *Franks* inquiry: that the affidavit contained a false statement.  Nor can he, where the Affidavit accurately reflected Briscoe's statement to law enforcement on January 9, 2018.  Briscoe reported to Detective Wise that he observed two males running from the Lexus to the Toyota just after hearing gunshots.  The Affidavit indicates the same.  Similarly, Briscoe identified the two people he saw running from the Lexus as the two defendants, referring to defendant Vines by his nickname, B.Y.  Briscoe later viewed a single photograph of defendant Vines and confirmed that it was the person he referred to as B.Y.  The Affidavit indicates the same.  The government is unable to detect where any falsity or reckless disregard for the truth exists.

Yet, defendant Vines insists that because the government did not rely on defendant Briscoe's identification of Vines in any other warrant, hearing, or grand jury proceeding, it must be a false statement or suggestive identification.  *Id.* at ¶¶ 6-7.  Indeed, defendant Vines goes even further with his accusation, alleging that the government used Briscoe's identification "solely" to obtain the warrant, and then "dropped [it] completely from the case – as though it never occurred or that law enforcement knew W-2 was not credible or did not actually make a positive identification."  *Id.* at ¶ 9.  This is not only a very serious ethical accusation, but it is also pure conjecture.  Defendant Vines provided no proof that the statement of identification was false or that Detective Wise recklessly disregarded the truth by including it in the Affidavit.  Rather, he assumes, and asks this Court to conclude, that that it must be false or else the government would have relied on it more.  This type of speculation is exactly what *Franks* contemplated and

11

disallowed. *Franks*, 438 U.S. at 171. Thus, defendant Vines has not met even the first prong of the *Franks* inquiry, that the affidavit contained a false statement, and his motion should be denied.

Defendant Vines also complains that the Affidavit "provides no information concerning [W2's] prior relationship to police, benefits conferred, motives, or other factors relevant to the circumstances of the alleged identification." To the extent that defendant Vines is arguing that this was a material omission under *Franks*, this too fails to satisfy the threshold showing that would require a hearing. A court's task when the defendant claims "a deliberate falsehood or omission" in the Affidavit is to "excise any information that is allegedly false and include any information allegedly omitted, thus creating a 'hypothetical, redacted affidavit,' and it must then ask whether that affidavit 'still established probable cause.'" *Lane v. District of Columbia*, 211 F.Supp.3d 150, 173 (D.D.C. 2016) quoting *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013). Here, including the omitted information the defendant complains about would have strengthened probable cause, rather than defeat it. Indeed, including in the Affidavit that Briscoe admitted he was Vines' getaway driver, implicating both himself and Vines, along with his statements that he knew Vines for several months, that he knew Vines' full name and nickname, that they both associated with Clay Terrace, that they had friends in common, and that Briscoe had Vines' cell phone number in his phone, would have bolstered the government's probable cause for the cell site warrant. Admittedly, Briscoe had a motive to curry favor with the government at the time that he made these statements, as he was under arrest for armed robbery, but where no promises were made to him in exchange for the information, and where he implicated himself in the same crime, neither of these factors would have negated probable cause. Moreover, when reviewing the totality of the Affidavit, which established a ballistics connection between the murder of Ms. Lewis and Mr. Coles, described the temporal proximity of the two killings, included information about the

motive behind Ms. Lewis' murder, provided nexus between Clay Terrace and that motive, and included evidence of defendant Lewis' culpability as well as evidence of defendant Lewis' communications with defendant Vines the day of the murders, there is no reason to believe that the added information would have defeated probable cause.

Defendant Vines also claims that the identification procedure with W-2/Briscoe was unconstitutionally suggestive and intimates that omitting the circumstances of the procedure and the factors of reliability from the Affidavit amounted to a material omission as contemplated by *Franks*. *See* Def. Mot., ECF 135 at ¶ 9. Vines' argument is premised upon a faulty assumption, however: that W-2 is someone who does not know Vines. Yet, the evidence is clear that Briscoe not only knew Vines for several months, but that they were friends. Moreover, the fact that Briscoe admitted to being Vines' getaway driver after Ms. Lewis' murder, establishes that he had more than ample opportunity to observe Vines at the time of the murder. Accordingly, omitting the circumstances of Briscoe's identification, and the factors contributing to the reliability of that identification from the Affidavit, did not negatively affect the probable cause determination. Indeed, were those factors included in the Affidavit, the probable cause to obtain Vines' cell site data would have been all the stronger. As a result, the Affidavit did not contain either materially false statements or omissions, and defendant Vines' motion should be denied.

II. BRISCOE'S IDENTIFICATION OF VINES WAS NOT IMPERMISSIBLY SUGGESTIVE AND THE CIRCUMSTANCES OF HIS OBSERVATIONS WERE RELIABLE

The admissibility of identification evidence is governed by "fairness as required by the Due Process Clause." *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977)); *see also Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification

procedure that is both suggestive and unnecessary." (citing authorities)). "If an out-of-court identification is held inadmissible, any subsequent in-court identification by the same witness will be barred, unless the prosecution can show an independent, untainted source of the in-court identification." *United States v. Lawson*, 410 F.3d 735, 739 n.3 (D.C. Cir. 2005) (citing *United States v. Wade*, 388 U.S. 218, 241 (1967)).

In ruling on a motion to suppress an identification, a court must first determine "whether the identification procedure was impermissibly suggestive." *Rattler*, 475 F.3d at 411 (internal quotation marks omitted) (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)). Even if the procedure is found to be improperly suggestive, however, an in-court identification need not be excluded if, "under the totality of the circumstances, the identification was sufficiently reliable to preclude a very substantial likelihood of irreparable misidentification." *Id*. (internal quotation marks omitted) (quoting *Manson*, 432 U.S. at 116). The Supreme Court has made clear that "'[r]eliability of the eyewitness identification is the linchpin of that evaluation,'" and that identification evidence should not be suppressed unless "'the indicators of a witness' ability to make an accurate identification' are 'outweighed by the corrupting effect of law enforcement suggestion.'" *Perry*, 565 U.S. at 724-25 (alterations omitted) (quoting *Manson*, 432 U.S. at 114).

Courts considering a motion to suppress identification evidence generally place the burden, first, on the defendant to demonstrate that the identification procedure was impermissibly suggestive. *See United States v. Jones*, 689 F.3d 12, 17 (1st Cir. 2012); *United States v. Washam*, 468 F. App'x 568, 576–77 (6th Cir. 2012); *United States v. Mendoza*, 401 F. App'x 739, 741 (4th Cir. 2010). If the defendant meets this burden, the government then bears the burden of demonstrating, under the totality of the circumstances, that a challenged identification is

sufficiently reliable to permit an in-court identification. The Supreme Court has set forth five factors, the positive presence of which would support the admission of an identification even in cases where it is demonstrated that a suggestive procedure has been used. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972). The five factors include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.*

For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification; such risk is simply not present here. *See United States v. Walls*, 237 F. App'x 599, 601 (11th Cir. 2007), *citing Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987). The concerns present in stranger identifications are absent where the identifying witness knows and has a relationship with the individual who is identified. *See, e.g.*, *United States v. Veloz*, 109 F.Supp.3d 305, 312 (D. Mass. 2015) (collecting cases and noting that "[i]t is uniformly held by state and federal courts, that where a witness is shown to have had prior familiarity with a defendant, a due process hearing need not be held, as no amount of police suggestion is likely to have influenced the witness's identification"); *see also United States v. Henderson*, 320 F.3d 92, 101 (1st Cir. 2003).

In the instant matter, the witness making the identification – a co-defendant – knew defendant Vines. Moreover, prior to being shown the single photograph of Vines, Briscoe had identified him by nickname and inculpated him in the murder of Ms. Lewis. He had also correctly stated that Vines had been incarcerated and had been released in November 2017, that Vines had run away from a half-way house on the night of the murders, had accurately described defendant Vines when asked, and had indicated that he knew defendant Vines' government name. All this

information was provided to Detective Wise before he showed Briscoe a confirmatory photograph of Vines.  Furthermore, evidence at trial will establish that not only did Briscoe and Vines know each other, but they both associated with Clay Terrace, had attempted to rob Whitaker together before the murders, and were good friends.  Thus, there is no danger that the single confirmatory photo suggested the perpetrator to Briscoe or otherwise influenced his identification, and Vines' motion should be summarily denied.

Beyond a pre-existing relationship with Vines, Briscoe's identification also satisfied the reliability analysis as established in *Neil v. Biggers*, 409 U.S. 188 (1972).  *See also Manson,* 432 U.S. at 114 (holding that single-photo identification procedure, despite being suggestive, was constitutional because it was reliable).  A review of these factors demonstrates that: Briscoe had an opportunity to view Vines at the time of the crime; as the getaway driver he was paying a high degree of attention at the time of the crime; he accurately described defendant Vines; he had a high level of certainty that Vines was the perpetrator; and he identified Vines just days after the murder.  The satisfaction of these factors, along with their pre-existing relationship, ensures that Briscoe's identification of Vines is "sufficiently reliable 'to preclude a very substantial likelihood of irreparable misidentification.'"  *United States v. Mosquera-Murillo,* 153 F.Supp.3d 130, 207 (D.D.C. 2015) (citing *Rattler*, 475 F.3d at 411).  Accordingly, defendant Vines' motion should be denied.

## CONCLUSION

For the forgoing reasons, the United States respectfully requests that the Court deny the defendant's motion.

                                        Respectfully submitted,

                                        MATTHEW M. GRAVES
                                        United States Attorney
                                        DC Bar No. 481-052

By:    /s/ *Kimberley C. Nielsen*
            Kimberley C. Nielsen
            Assistant United States Attorney
            N.Y. Bar No. 4034138
            George Eliopoulos
            Colleen Kukowski
            Assistant United States Attorneys
            601 D Street, N.W., Room 3.208
            Washington, D.C. 20530
            (202) 252-7418
            kimberley.nielsen@usdoj.gov